[Civil No. 3559. Filed January 20, 1936.]

[53 Pac. (2d) 857.]

THE VALLEY BANK & TRUST COMPANY, a Corporation, Executor of the Last Will and Testament of George W. P. Hunt, Deceased, Appellant, v. B. D. PROCTOR, Appellee.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Mr. William C. Fields, for Appellee.

ROSS, J.—In the opinion in *Proctor* v. *Hunt et al.,* 43 Ariz. 198, 29 Pac. (2d) 1058, it was decided that the complaint did not state a cause of action against the state auditor or state treasurer, but did state a cause of action against Governor Hunt, and as to him the case was remanded for trial on its merits. Thereafter a trial before the court with a jury resulted in a verdict and judgment for the plaintiff, and this appeal is from such judgment. Subsequent to the trial and the appeal Governor Hunt died, and the Valley Bank & Trust Company, the executor of his last will and testament, was substituted as party appellant.

The action was brought under the provisions of sections 105, 106, and 107, Revised Code of 1928. The gravamen of the complaint is that the Governor approved of many claims and demands on the state for goods, wares, and merchandise furnished him for his private and personal use and not for a governmental or public use.

Section 105, *supra,* provides generally that any public officer who approves of any claim or demand against the state not authorized by law shall be liable for any money thereby procured and 20 per cent. in addition thereto and legal interest upon such payment from date thereof.

Section 106 makes it the duty of the Attorney General to bring an action to enjoin illegal payments, or if already paid out to recover them with 20 per cent. penalty, interest, and costs, all to be paid into the state treasury.

Section 107 authorizes any taxpayer to bring the action in his own name if the Attorney General shall fail for sixty days after request in writing to do so "with the same effect as if brought by the attorney

general." If in the taxpayer's action he prevails, the court may allow him costs and a reasonable attorney's fee, not to exceed 40 per cent. of the amount recovered or saved to the state.

In this case the Attorney General refused, after request in writing so to do, to bring the action, and it was then instituted by B. D. Proctor, a taxpayer.

█ The first assignment of error is the order of the court overruling demurrer to the complaint. After the case was remanded and before trial plaintiff amended the complaint. The nature and extent of the amendment we find it difficult to determine. Defendant says the complaint as amended contained "certain items" that were not in the original or first amended complaint. Plaintiff says the items questioned were included in the original and the only variance "was mistakes in addition." The ground of the demurrer was that the complaint on its face showed that those "certain items" accrued more than one year before the amendment, and that therefore, as to such items, the one-year statute of limitations had run. Subdivision 3, § 2058, Id.

This action, while brought in the name of a private person, is really in the interests of the state. It involves the right of the state to recover money unlawfully appropriated or expended by one of its officers. Section 2056, Id., reads as follows:

"The rights of this state shall not be barred by the limitations of actions prescribed in this chapter."

The money sought to be recovered was the state's money, and, if recovered, must be paid into the state treasury. The trial court was of the view that the limitation did not run because it was, in effect, an action for the state, and we agree that that conclusion was correct. The demurrer was properly overruled.

The action was for over $2,000 and the recovery is only $329.89 plus penalties, costs, and attorney's fees.

The other assignments go to the court's rulings on questions of law and to the weight and sufficiency of the evidence to support the judgment. In our former opinion, in passing upon the sufficiency of the complaint, we stated the law to be:

"It is, of course, axiomatic that money raised by public taxation is to be collected for public purposes only, and can only legally be spent for such purposes and not for the private or personal benefit of any individual. Sections 1 and 7, article 9, Constitution of Arizona. It is equally axiomatic that public money may not be spent, even for public purposes, unless somebody, authorized by the Constitution and the law to do so, has made an appropriation therefor. Section 5, article 9, Constitution of Arizona. Under our system of government, these appropriations may only be made by the direct authorization of the people, through the Constitution or an initiated act, or by an act of the Legislature, which has plenary power over the expenditures of public money, except as restricted by the terms of the Constitution. This legislative power may be exercised directly, as in the various appropriation bills made by the Legislature from time to time, or indirectly, through the establishment of subordinate municipal corporations, such as counties, cities, school districts, and the like, and the authorizing of them to spend certain portions of the public money, but in the end all appropriations are based upon the affirmative act, either of the people or of the Legislature. . . .

"If it be true that he [governor] audited and approved claims against the state for money which was expended for his personal and private use, and not for a public use, . . . it certainly was sufficient to sustain an action under section 105, *supra*."

The Governor having denied expending any of the state's money for his personal and private use, evidence *pro* and *con* on that issue was submitted to the

court and jury, and these triers of the facts determined that defendant had spent $329.89 of the state's money for his own personal and private use. In the course of the trial, the evidence as to many of the items being undisputed, the court, on motion of plaintiff in some instances, directed a verdict for plaintiff, and in some instances, on motion of defendant, directed a verdict for defendant, and, where the evidence was in conflict as to any item, left it with the jury under general instructions.

 Ordinarily, when no complaint is made of the instructions, and there is none here, we content ourselves with the verdict and refuse to go into the case any further. The rule has always been for this court to accept, when the evidence is conflicting, the verdict or conclusion of the trier of the facts, whether a jury or court, and we may make no exception to that rule. We will review the evidence, therefore, only for the purpose of determining whether upon the uncontroverted facts the Governor expended the state's money for a public purpose or for his own personal and private use.

 One of the items he caused to be charged against and paid by the state was for a group photograph of five persons, including himself. He approved a claim by the photographer for five copies of the photograph, at $1.50 each, kept one, which he framed and hung in his office at his home, and gave one copy to each of the others of the group. This item was paid out of the Governor's *contingent* fund.

Into another class falls what is designated by counsel as "travel expense." These items amount to $250.64, and were for expenses of guests the Governor took with him on trips: To Agua Caliente, to meetings of the Board of Regents of the University at Tucson, to Nogales, and to other places in the state.

Such guests were generally some employee of the state or some local citizen that the Governor decided or chose to ''treat'' to the trip, including his transportation in the Governor's automobile, his board and lodging. These items were charged against the *travel* fund.

Then there was a class called the ''book items,'' which amounted to $71.75. There were nineteen of these books, and their titles (authors not given) and the amounts paid for them are as follows:

| | |
|---|---:|
| ''South America'' | $ 4.00 |
| ''High Tartar'' | 4.00 |
| ''Ancient Life'' | 5.00 |
| ''Mysterious Sahara'' | 5.00 |
| ''Central America'' | 3.00 |
| ''Minoans, etc.'' | 5.00 |
| ''Mogreb-el-Acksa'' | 3.50 |
| ''Bird Islands of the Pacific'' | 5.00 |
| ''Pagans Pilgrims'' | 2.50 |
| ''Confucius Confucianism'' | 1.75 |
| ''Fugitives in the Jungle'' | 3.00 |
| ''Aurica (America) from Port to Port'' | 5.00 |
| ''Jungle Ways'' | 3.50 |
| ''Henry the VIII'' | 1.00 |
| ''Story of Phil'' | 1.00 |
| ''Undiplomatic Memories'' | 3.00 |
| ''Ra Tau'' (Roi Tan) | 2.50 |
| ''Science of Life'' | 10.00 |
| ''Green Hell'' | 4.00 |

The defendant testified that they were bought for the use of the Governor's office. It is admitted that none of the books was in the office when his successor took possession thereof, and this is explained by Governor Hunt's secretary, who stated that they were sent by him to the state prison at Florence and to the pioneers' home at Prescott. These books were paid

for out of the *operation* fund, although the Governor stated they were bought with the *contingent* fund.

There was appropriated for the office of Governor during the times the above sums were paid out, to wit, the fiscal year 1930–31:

"For operation ........................$7,500.00
For Travel ............................ 2,000.00
For Capital Investment ................. 475.00

Contingent Use .........................5,000.00"
 Subdivision 28, § 1, chap. 104, Laws 1929.

The terms "operation," "travel," etc., are defined by section 2618 (part of Financial Code), Revised Code of 1928, as follows:

"The purposes for which appropriations are made shall be classified as follows: Salaries and wages; operation; travel; capital investment; repairs and replacement; and contingencies. Under . . . *operation* the expenditures incident to the conduct of an office, or maintenance of an institution or school; under *travel* all charges and expenses incident to traveling on official business; under *capital investment* the expenditures for visible, tangible personal property of a non-consumable nature, all items of fixtures or apparatus, the enlargement or improvement of existing buildings (other than repairs), and the construction of new structures; . . . and under *contingencies* the expenditures for purposes not covered in other items." (Italics ours.)

None of the expenditures enumerated fall into *operation* and could not legally have been paid out of that fund.

■ The Governor, while "traveling on official business," could legally collect from the state the expenses of his trip, such as board and lodging for himself and his chauffeur, gas and oil for and repairs to the state's automobile, but could not legally pay the board and lodging of persons accompanying him as companions or guests on such trips out of the

travel or any other fund. Nothing could be plainer. The reason for the limitation is imperative. The language needs no elaboration or explanation. It is unthinkable that the legislature would open the purse strings of the state to its public officers for trips of pleasure and recreation for themselves, much less for their companions and guests. Speaking of this situation, the defendant in his brief says:

"We have been unable to find any direct law on this subject, but do know as a matter of practical application that public officials, such as the Governor, whose duty requires them to travel about the state for many purposes, invariably entertain guests for one reason or another, at state expense, and we do not believe that it was ever intended by the Legislature to deprive the Governor of the privilege of entertaining guests while traveling on official business of the state."

If public officials of the state are spending the public funds entertaining guests while traveling on official business, it should be stopped. We cannot think that the legislature intended that public officials should use the taxpayers' money in that way, and we know that if the legislature did so intend the legislation is in conflict with the Constitution and invalid. The Constitution (section 1, art. 9) provides that "All taxes . . . shall be levied and collected for public purposes only."

None of the funds appropriated to the Governor's office could possibly be drawn upon to pay for the group photograph and the books, unless it be what the legislature has designated as "contingencies." Five thousand dollars was appropriated to his office for contingencies or "expenditures not covered in other items." Before this appropriation was reached, it being listed last in order, the legislature had enumerated several purposes for which the Governor was

authorized to expend public moneys; as, for instance, salaries, operation, etc., and, to be sure that he would not be hampered in his duties, gave him the ''contingent'' fund, with authority to expend it, or any part of it, as he found necessary to properly and efficiently discharge any contingent, probable or incidental official duty that might arise, the expense of which was not covered by other appropriations; or, stated another way, it was given to him for legitimate expenses arising from unforeseen causes. Of course, that would preclude the spending of the contingent fund for the Governor's personal or private pleasure or entertainment or for salaries or operation or capital investment, etc., since salaries, etc., are expressly provided for by the legislature.

Books purchased for the Governor's office, like chairs, desks, typewriters, etc., ordinarily would be capital investment, to be permanently kept in the office for the use of the officials in that department. These books, judging from their titles, had no relation whatever to the duties of the office of Governor, but treated of a great variety of subjects: History, biography, philosophy, religion, anthropology, biology, travel—all very interesting, educational, and informative, if one has time to read them, but no one in the employ of the state should read them on the state's time. Such books might be given a place in one's private library, or in a public library, but they are hardly fit tools with which to perform the duties of a busy public office. If these books were not capital investment for the Governor's office, they necessarily were for his personal and private use, and the fact that his secretary donated them to the pioneers' home and the state prison negatives the idea that they were for the office of the Governor, and rather confirms the idea that they were regarded as

private property, to be passed on to whomever or whatever institution the Governor or his secretary should select. It was the province of the legislature to determine the needs of the state prison and the pioneers' home and to make appropriations therefor, and this it did. Subdivisions 48, 51, § 1, chap. 104, *supra.*

 The contingent fund is a grab-all for the miscellaneous and unforeseen incidental expenses of the Governor's office, but these expenses must be for the public use or some governmental purpose or else they cannot be paid out of the state's moneys. The appropriations to defray the expenses of the different offices, departments, and institutions of the state are from the property taxes of the state, and such taxes are levied and collected for public purposes and can be spent for such purposes only.

The only item drawn against the Governor's contingent fund was the group photograph mentioned above. That such expense was purely personal and private there can be no question. While the contingent appropriation is for indefinite and unforeseen expenses, such expenses must, at all events, be for a public purpose.

We will state that a reading of Governor Hunt's testimony convinces us that he believed he had a right to make the purchases enumerated and charge them to the state; also to pay the hotel bills and meals of his guests on business trips made by him, and that he did these things through no dishonest motives. He was simply mistaken as to the law.

We find no reason either in law or fact for reversing the judgment, and it is accordingly affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.